Yasser A. Madriz, Texas Bar #24037015
Meghaan C. Madriz, Texas Bar #24070241
Sarah Holub, Texas Bar #24106108
(*pro hac vice applications forthcoming*)
**MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP**
845 Texas Avenue, Suite 2400
Houston, Texas 77002
(832) 255-6361 Telephone
(832) 214-9931 Facsimile
ymadriz@mcguirewoods.com
mmadriz@mcguirewoods.com
sholub@mcguirewoods.com

*Lead Counsel for Plaintiff*

Tanner J. Bean, #17128
Sarah C. Vaughn, #14615
**Fᴀʙɪᴀɴ VᴀɴCᴏᴛᴛ**
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
Facsimile: (801) 531-1716
spetersen@fabianvancott.com
svaughn@fabianvancott.com

*Local Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **ACUREN INSPECTION, INC.,** | **PLAINTIFF ACUREN INSPECTION, INC.'S ORIGINAL VERIFIED COMPLAINT, APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND REQUEST FOR INJUNCTIVE RELIEF** |
| *Plaintiff,* | |
| v. | |
| **MICHAEL HILL AND MISTRAS GROUP, INC.,** | Civil No. _____ |
| | Judge _____ |
| *Defendants.* | |

Plaintiff Acuren Inspection, Inc. ("Acuren" or "Plaintiff") files this Original Verified[1] Complaint and Application for Temporary Restraining Order and Request for Injunctive Relief ("Complaint") against Defendants Michael Hill ("Hill") and Mistras Group, Inc. ("Mistras") (collectively, "Defendants").

## NATURE OF THE ACTION

1.    Hill, a former long-time employee of Acuren, who helped start Acuren's operations in Utah and the surrounding areas, recently resigned from Acuren to join Mistras, a competitor of

---

[1] The factual statements in this Original Verified Complaint are verified by the Verification of Trey Spencer, attached hereto as Exhibit 1, and the Verification of Erik Barlow, attached hereto as Exhibit 2.

Acuren in the non-destructive testing ("NDT") and non-destructive examination ("NDE") space. Hill joined Mistras in a Regional Manager role and immediately began pursuing his former Acuren clients for the benefit of Mistras, in direct violation of his customer non-solicitation covenant. Hill similarly waited no time upon joining Mistras to solicit Acuren employees to join him at Mistras, in violation of his employee non-solicitation covenant. Hill additionally absconded with Acuren's confidential information and trade secrets, connecting an external storage device to his Acuren laptop after his last day of employment and creating customer-specific folders on such external storage device to use Acuren's confidential information and trade secrets in his employment with Mistras. Acuren now seeks relief from this Court for Defendants' willful attack on its business and files this civil action for damages, a temporary restraining order, and preliminary and permanent injunctive relief for Defendants' respective violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("DTSA"), Utah Uniform Trade Secret Act, Utah Code Ann. § 13-24-1 et seq. ("UUTSA"), breach of non-disclosure and non-solicitation covenants in Hill's Restricted Activities Agreement ("Agreement") with Acuren, tortious interference with contract, breach of fiduciary duty, tortious interference with existing contracts and prospective business relationships, civil conspiracy, and conversion.

## THE PARTIES

2.    Plaintiff Acuren is a Delaware corporation with its principal place of business located at 14434 Medical Complex Drive, #100, Tomball, Texas 77377. Acuren is a global provider of industrial contracting services, focusing on non-destructive testing, inspection services, engineering services, and rope access work.

3.    Defendant Hill is a former Acuren employee residing at 913 N Yacht Club Dr., Eden, Utah, 84310.

4.      Mistras is a Delaware corporation engaged in interstate commerce, doing business in multiple states. Mistras' principal place of business is located at 195 Clarksville Road, Princeton Junction, New Jersey 08550. Mistras may be served through its registered agent, Corporation Service Company, at 15 West South Temple, Suite 600, Salt Lake City, Utah, 84101.

## JURISDICTION, VENUE, AND CHOICE OF LAW

5.      This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Acuren asserts claims for misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1831 *et seq*., against both Defendants.

6.      This Court has supplemental jurisdiction over Acuren's remaining claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims in this action over which the Court has original jurisdiction that they form part of the same case or controversy.

7.      Defendants are subject to this Court's jurisdiction because Acuren's claims, as set forth herein, arise out of or relate to Defendants' transaction of business within this state and the causing of Acuren's injury within this state. *See* Utah Code Ann. § 78B-3-205(1) and (3).

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged occurred in this judicial district or, as shown above, Defendants are subject to this Court's personal jurisdiction with respect to this action.

## BACKGROUND

The facts underlying Acuren's claims against Defendants are as follows:

**A.    Acuren's Business.**

9.      Acuren is the largest NDT and NDE contractor in North America.[2] Since its

---

[2] The difference between NDT and NDE is very slight. In fact, the terms NDT and NDE are often used interchangeably. NDT is a testing and analysis technique used to evaluate materials and structures in order to identify

inception in 1974, Acuren has been a trusted, single source provider of technology-enabled asset protection solutions used to evaluate the structural integrity of critical energy, industrial, and public infrastructures.

10.    Acuren's clients rely on its NDT offerings to prevent critical failures and plant downtime. Put simply, no matter what structural integrity issue a client faces, clients can rely on Acuren to have the technicians and technology to fulfill their NDT needs. Acuren's NDT offerings to clients run the gamut—from capital construction projects to "call-out" and "nested" work (or "run and maintain" work).  Acuren's offerings range from basic to advanced NDT services, as well as visual inspections and consulting services.[3]

11.    As just one example, and relevant to this action, Acuren performs both "call-out" work and "nested" work for its clients. For this type of work, Acuren's client is generally the operator or owner of the plant, and the work involves NDT inspection services on existing pipes already installed and located in a plant or a client facility. Distinguishably, though, "call-out" work is more intermittent and conducted on an as-needed basis, whereas "nested" work involves ongoing, scheduled inspection work performed by dedicated Acuren inspectors (or technicians) that work at the client's site on a regular basis.  While call-out and nested work both primarily involve basic and/or advanced NDT services, the scope of such projects or work can also include visual inspections and consulting services.

---

defects and discontinuities. This type of testing can recognize faults and defects without causing damage to the original material or structure. Though NDT also is commonly referred to as NDE, there is, however, a slight difference between NDT and NDE. While NDT is restricted to testing, NDE includes both testing and the evaluation of the results. That is, NDT is used to locate defects in an asset while NDE is used to locate defects while also measuring the size, shape, orientation, and other physical characteristics of the defect.  But, for purposes of this complaint, the term NDT will be used to refer to NDT and NDE services.

[3] For example, Acuren offers radiographic testing for x-ray and gamma radiographic examination of weldments, castings, shop fabrication, and plant piping systems. It also offers ultrasonic testing for ultrasonic thickness measurement and ultrasonic flaw detection and other NDT and inspection methods, such as liquid penetrant examination, magnetic particle examination, and ground penetrating radar.

12.     Acuren's client base is as diverse as Acuren's offerings. Acuren has NDT clients in the refinery, chemical, pipeline, storage tank, power generation, pulp & paper, aerospace, automotive, and pharmaceutical industries, among others.

**B.     Hill's Employment with Acuren**

13.     Acuren initially hired Hill in or around 2006 as a Level II Field Technician based in Denver, Colorado. As a technician, Hill performed nested and call-out work for Acuren's clients and immediately began forming client relationships.

14.     Based on Hill's success as a technician, in or around August 2009, Hill was promoted to the role of Operations Manager for Salt Lake City, Utah. Specifically, Acuren entrusted Hill with initializing Acuren's efforts to form a client base in Salt Lake City, Utah, with the goal of establishing a permanent expansion office in Salt Lake City by early 2010 and, thereafter, to continue to supervise the growth of Acuren's business in Utah. Acuren put forth a significant financial investment towards Hill's success in the Salt Lake City area, providing Hill a $2,800 relocation expense to cover his move to Utah and a $1,000 monthly living allowance for up to six months after his move.

15.     Indeed, Hill was involved in the development of Acuren's client relationships in Salt Lake City at every level—from marketing and sales, to serving as technician and supervisor— and regularly used Acuren resources to obtain new clients. Specifically, Hill was involved in entering master service agreements with major clients of Acuren, like Tesoro Refining, Questar Gas, Monsanto, Agrium, and others by 2010.

16.     Additionally, Hill was also responsible for the management of Acuren's technicians who performed the call-out and nested work within his division. Indeed, Hill was actively involved in the recruitment and development of Acuren technicians and inspectors.

17.     After being promoted to Division Manager and Quality Manager in or around 2012, Hill trained and tested inspectors, oversaw the development of technicians to specialize in new technologies, and grew the Rocky Mountain Region by more than 27 employees by 2013. The Acuren technicians in Hill's division, as well as his successor Operations Manager, reported directly to him with regard to their call-out and nested work.

18.     Thus, since 2009 and in his various roles, Hill has had intimate contact with all of Acuren's Salt Lake City area customers and employees. In fact, Hill's brother, Robert Hill, is currently the District Manager over Acuren's Salt Lake City operations.

19.     In or around 2014, Hill was again promoted, this time to Rocky Mountain Regional Manager, which encompassed Acuren locations in Colorado, Utah, California, North Dakota, Montana, Washington, Oregon, and Arizona. In this role, Hill had nearly complete oversight of $30 million of Acuren's business (attributable to his region). Hill was responsible for generating revenue and management of the region's EBITDA and was given spending power, capital expenditure power, hiring power, and the ability to agree to rates and terms with Acuren's customers. Further, Hill was specifically tasked with establishing onsite crews for another Acuren client, Chevron, in Salt Lake City, guiding Acuren's Denver and Kansas City locations into diverse markets like refining and power generation, and, generally, continuing the growth of the Rocky Mountain Region through work and client relation initiatives.

20.     Then, on October 16, 2022, Hill was moved to Regular Full-Time US Director, Commercial & Business Development. In this role, Hill reported to Acuren's then EVP – Operations, US, Dal Miller, and worked for Acuren's Corporate G&A office.

21.     Finally, around February 2024, Hill's role shifted into a Regional Account Executive position reporting to Trey Spencer ("Spencer"), Senior General Manager – US West

Region. (*See* Letter re: 2024 "Growth by Design" Reorganization, attached hereto as <u>Exhibit 3</u>.) The shift came as a result of Acuren's need to reorganize its sales team following Acuren's first "flat" quarter in recent history. As a Regional Account Executive, Hill was tasked with devising and executing new business development plans to increase revenue, expand market presence, and identify new opportunities for growth in Acuren's sales for the US West Region, which spans from Corpus Christi, Texas to Torrence, California, including Acuren's locations in Border, Texas; Salt Lake City, Utah; Willis, North Dakota; San Francisco, California; and Washington State. Specifically, Hill was responsible for developing and maintaining customer relations with many of Acuren's institutional customers as well as identified key target customers and preparing bids and requests for proposals for customer work and long-term contracts.

22.    Notably, as of October 24, 2024, Hill was reporting on several ongoing or upcoming bids and developing relationships with ABB, Chevron Richmond, Chevron El Segundo, Chevron OSI, Phillips 66, P66 Rodeo, Georgia Pacific, PBF Toledo, and BHI. (*See* October 24, 2024 Weekly Report, attached hereto as <u>Exhibit 4</u>.) Additionally, Hill was intimately involved, including the development of bids and proposals for and generally maintaining Acuren's relationship with, Acuren clients such as Chevron Richmond, Chevron El Segundo, Chevron OSI, Marathon Petroleum Company LP, Gulf Run Transmission, LLC, CBI Services/McDermott, HF Sinclair, Valero Benicia Refinery, Formosa Plastics, DOW Seedrift, Phillips 66, and CenterPoint Energy, LLP.

**C.    Acuren Entrusted Hill with Confidential and Trade Secret Information.**

23.    Given the nature of Hill's job duties and employment with Acuren for several years, Hill was exposed to, entrusted with access to, and had deep familiarity with Acuren's proprietary, confidential, and trade secret information necessary to establish and grow Acuren's business in the

West Region and, specifically, in Salt Lake City, Utah, and, generally, run Acuren's NDT inspection operations for call-out and nested work.

24.     Acuren recruits, trains, and promotes key employees—like Hill—and entrusts them with proprietary, confidential, and trade secret information regarding Acuren's NDT inspection business for call-out and nested work. Such proprietary, confidential, and trade secret information includes, without limitation: (1) protected customer information (customer lists, job history, job schedules, pricing, rates, bids, quotes, opportunities, contacts, MSA terms and expiration dates, contracts, preferences, purchasing history, sales volume, frequencies/schedules, and reports); (2) protected employee information (employee lists containing contact information, compilations of job duties and responsibilities tailored to customer needs, compensation, and benefits); (3) protected financial and operational information (operational strengths and weaknesses, profit and loss information, revenue information, budgets and forecasts, business plans, growth and marketing strategies, growth for managing KPIs, marketing plans, and pricing strategies); (4) protected inspection manuals, methods, testing procedures, reports, and quality and safety programs; and (5) protected contractor and vendor information (preferred vendor sources for products, vendor purchasing histories, compilations of vendor pricing, rates, and services with relationship discounts, vendor lists containing contact information for key decision-makers, vendor preferences, contractor lists containing contact information, preferred contractors for certain geographic regions or customers, contractor pricing, rates, discounts, and mark-ups, and specialized services performed by contractors).

25.     Acuren expends significant time, effort, and expense developing and maintaining its proprietary, confidential, and trade secret information, recruiting and training supervisors, managers, salespeople, and technicians to support their operations, and developing relationships

with NDT customers—especially as it relates to nested and call-out NDT inspection work. Acuren invests significant time, money, and energy into researching customer needs, developing marketing plans, gathering financial data, revenues, and profit margins, creating pricing and discounts, building relationships with its customers, and developing its testing and safety processes, protocols, and procedures. Acuren's financial success and ability to compete in the NDT inspection business hinges on its proprietary, confidential, and trade secret information. Indeed, in the Agreement, Hill expressly acknowledged and agreed that Acuren developed such Proprietary Information (as further discussed below) "through substantial expenditures of time, effort and money." (*See* Restricted Activities Agreement, attached hereto as Exhibit 5, at § 2(a).)

26.     Acuren, therefore, considers the confidential and trade secret information described throughout this Complaint as highly-sensitive, proprietary, and confidential and, as such, vigorously safeguards it. Acuren's trade secret information is not readily available to the public, nor readily ascertainable from information in the public domain. Thus, such information derives independent economic value by providing Acuren a competitive advantage in the market. Undoubtedly, Acuren would be unfairly and competitively disadvantaged if any employee—in this case, Hill—improperly used or disclosed its trade secret information.

27.     Consequently, Acuren has implemented measures to preserve and protect the confidentiality of its proprietary, confidential, and trade secret information, which, among other things, include: (i) requiring employees to sign agreements in which they agree to keep Acuren's confidential information confidential (such as Hill's Agreement); (ii) outlining policies for protecting Acuren's confidential information in the employee handbook; (iii) restricting electronic access to certain information stored on Acuren's network; (iv) limiting access rights to certain folders stored on Acuren's network; (v) password protecting certain folders containing

electronically stored confidential or trade secret information; (vi) requiring employees to attend annual training (as to their obligations to protect Acuren's confidential information and not use or disclose such information for the benefit of others); and (vii) including confidentiality disclaimers on emails transmitted to third parties. Additionally, certain key employees, such as Hill, are required to sign agreements in which they agree to relevant non-solicitation provisions.

28.    Because the success of any company, particularly one that provides such specialized inspection services, fundamentally depends on its proprietary, confidential, and trade secret information, it is imperative that Acuren's confidential and trade secret information be kept in strict confidence. Otherwise, Acuren will lose its ability to compete in the marketplace. Indeed, this is the very reason Acuren required Hill to sign the Agreement, which specifically requires him to—among other things—protect Acuren's proprietary, confidential, and trade secret information.

**D.    Hill's Restricted Activities Agreement.**

29.    On January 3, 2020, as a condition of being granted an equity interest and/or award of options in Acuren, Hill executed the Agreement, which contains provisions related to his non-solicitation and confidentiality obligations.[4] (*See* Ex. 5.)

30.    In relevant part, the Agreement first contains a non-solicitation covenant in which Hill agreed that:

(a) During the period commencing on the date hereof and ending on the later of (x) the date that is three years from the date hereof and (y) the date that is two years from the date [Hill] is no longer employed by or providing services to [Acuren] (the "Restriction Period"), [Hill] will not compete with the Business anywhere in the . . . states of Washington, Oregon, California, Utah, Montana, or Colorado, in accordance with this restriction, but without limiting its terms, during the Restriction Period, [Hill] will not:

        . . .

---

[4] The Agreement was entered between Hill as the "Restricted Party" and ASP Acuren Holdings, Inc. as the "Parent," but "together with any and all direct and indirect subsidiary companies." (*See* Ex. 5 at p.1.) Acuren is a subsidiary of Acuren Intermediate Holdings, Inc., formerly known as ASP Acuren Holdings, Inc. and, thus, a party to the Agreement.

(ii) solicit customers, vendors, manufacturers, business, patronage or orders for, or sell, any products and services in competition with, or for any business that competes with, the Business;

(iii) divert, entice or otherwise take away any customers, vendors, manufacturers, business, patronage or orders of [Acuren] or attempt to do so;

. . .

For purposes of this Section (1)(a), inclusive, and without limitation thereof, [Hill] will be in violation thereof if [Hill] engages in any or all of the activities set forth in such clause directly as an individual on his or her own account, or indirectly as a partner, sponsor, lender, joint venturer, employee, agent, salesperson, consultant, officer, manager, principal, director and/or in any other capacity of any Person, or as an equityholder of any Person in which [Hill] or his or her spouse, child, or parent owns, directly or indirectly, individually or in the aggregate, more than two percent (2%) of the outstanding equity interests.

(b) During the Restriction Period, [Hill] will not, directly or indirectly, (i) solicit or induce or attempt to solicit or induce any Covered Employee to leave employment with [Acuren] or cease performing services for the benefit of [Acuren] or (ii) hire any Covered Employee to provide services to any Person other than [Acuren.]

(Ex. 5 at § 1(a)-(b).)[5]

31.     Notably, the geographic limitation applicable to the non-solicitation covenants was specifically negotiated by Hill.

32.     The Agreement defines the term "Business" as "any businesses conducted by [Acuren] from time to time during the term of this Agreement, including without limitation, nondestructive testing and examination, inspection, rope access, materials engineering, maintenance, repair, industrial and similar services, manufacturing products relating to nondestructive testing and examination, and any other business engaged in by [Acuren], or with respect to which [Acuren] has taken any substantial steps to engage in, at any time during the two year period preceding [Hill's] termination of employment." (*Id*. at § 1(f).)  Further, a "Covered Employee" is defined in the Agreement to mean "any Person who is employed by Parent during

---

[5] While Section 1(a)(i) of the Agreement includes a non-competition covenant, Acuren is not seeking to enforce the non-compete covenant at this time and reserves the right to seek enforcement of the non-compete covenant under New York law, the stated choice of law in the Agreement.

the Restriction Period." (*Id.*) Finally, the Agreement defines a "Person" as "any natural person, firm, partnership, association, corporation, company, trust, business trust, or other such entity." (*Id.*)

33.    Next, with respect to his confidentiality obligations, Hill acknowledged that during the course of his employment, he "had and will continue to have access to confidential and propriety information and trade secrets of [Acuren]." (*Id.* at § 2(a).) Accordingly, he agreed that he:

> [S]hall maintain in strict confidence and shall not directly or indirectly disseminate, disclose or publish, or use for his or her benefit or the benefit of any person (other than [Acuren]) any Proprietary Information or deliver to any Person any document, record, notebook, computer program or similar repository of or containing any Proprietary Information.

(*Id.* at § 2(b).)  Further, Hill agreed that:

> [U]pon termination of his . . . employment with [Acuren] for any reason, [Hill] shall return to [Acuren], in good condition, all Proprietary Information, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of Proprietary Information.

(*Id.* at § 2(d).)

34.    Importantly, the Agreement defines "Proprietary Information" to include:

> [I]nformation with respect to [Acuren's] bids, projects, pricing methods and terms, costs, contractors and subcontractors, operations, processes, protocols, products, inventory, ideas, designs, inventions, know-how, engineering methods, proprietary software, business practices, actual and potential customers and suppliers, marketing methods, contractual relationships, regulatory status, compensation paid to employees or other terms of employment, dealers, distributors, sales representatives, sales, forecasts, projections and long range plans, financial and tax matters including but not limited to financial results and information, manufacturing, selling and servicing strategies and techniques, training, service and business manuals, promotional materials, training course and other training and instructional matters, personnel, plans and opportunities, and customer, vendor, and supplier data and other business information.

(*Id*. at § 2(a).) Notably, Hill expressly acknowledged that Acuren's Proprietary Information constitutes "valuable and unique property of [Acuren]" and, as such, agreed that the restrictive covenants in the Agreement were "necessary for the protection of the Business." (*Id*.)

35.    Hill further agreed that his obligations under the Agreement "are reasonable in the context of the Business and the competitive injuries likely to be sustained by [Acuren] if [Hill] was to violate such obligations." (*Id*. at § 3(a).) Indeed, Hill expressly recognized and acknowledged that "a breach of [Hill's] covenants in [the] Agreement would cause irreparable damage to [Acuren] and the goodwill of [Acuren], that the amount of such damages would be difficult or impossible to ascertain, and the that remedies at law for any such breach would be inadequate." (*Id*. at § 3(b).) Accordingly, Hill agreed that, in the event of his breach of the Agreement, Acuren "will be entitled to specific performance and injunctive relief," in addition to any other remedy available at law or in equity. (*Id*.)

36.    Finally, the parties agreed that the Agreement "shall be governed by and construed, interpreted and enforced in accordance with the substantive laws of the State of New York without giving effect to any conflicts or choice of laws principle or rule." (*Id*. at § 5.)

**E.    Hill Resigns from Acuren to Join Mistras.**

37.    Following his shift to the Regional Account Executive Role, Hill's performance at Acuren began to suffer. On information and belief, Hill felt the change in his role and, specifically, him reporting to Spencer, constituted a demotion.

38.    Nevertheless, Hill's pay and benefits did not change and, in fact, Acuren made and communicated plans to give Hill greater authority with respect to Acuren's sales in the US West Region. Specifically, Acuren planned to move all sales employees in the US West Region under Hill's supervision beginning in 2025, and tasked Hill with creating a management plan for this

expanded responsibility. Hill and Spencer planned to meet to strategize and discuss Hill's management plan in Salt Lake City in November of 2024.

39.     However, a day before their meeting in November, Hill informed Spencer that he was leaving Acuren and taking a job with Mistras as a Regional Manager based in Salt Lake City, Utah—a role nearly identical to his former role as Acuren's Rocky Mountain Regional Manager. Hill submitted his resignation letter on November 4, 2024, stating that his last day of employment with Acuren would be November 29, 2024, and that he would finish his time with Acuren "with a genuine level of care for the company." (*See* Resignation Letter, attached hereto as <u>Exhibit 6</u>.)

40.     Mistras, like Acuren, offers NDT inspection services such as radiographic testing, ultrasonic testing, magnetic particle examination, and liquid penetrant examination, among other services in several industries, including aerospace, infrastructure, manufacturing, oil and gas, and power.[6] Headquartered in Princeton Junction, New Jersey, Mistras engages in interstate commerce with locations throughout the United States, including, in relevant part, Colorado, Utah, Washington, California, Arizona, New Mexico, and Texas, and competes with Acuren in these locations.

41.     Hill's last day worked with Acuren was November 22, 2024.  On information and belief, Hill was already employed by Mistras at the time of his termination from Acuren.

42.     Given Hill's abrupt departure and immediate employment with Mistras in a nearly identical role to those previously held at Acuren, Acuren sent a letter to Hill reminding him of the Agreement and his obligations thereunder on December 3, 2024 ("Letter"). (*See* December 3, 2024 Letter, attached hereto as <u>Exhibit 7</u>.) Acuren copied Mistras' Executive Vice President, General Counsel, Michael Keefe ("Keefe"), on the Letter to ensure that Mistras was similarly aware of

---

[6] *See* https://www.mistrasgroup.com/how-we-help/field-inspections/ (last visited 12/30/2024.)

Hill's contractual obligations to Acuren. The Letter also demanded the immediate return of any Acuren-issued equipment as well as "any tangible confidential, proprietary, or trade secret information in [his] possession, *in any form*." (*Id.*)

43.    To date, Hill has not responded to the Letter. On December 20, 2024, Keefe responded to the Letter on behalf of Mistras, denying any wrongdoing by Hill or Mistras.

**F.    Hill's Unlawful Departure.**

44.    Upon information and belief, Mistras hired Hill to grow its NDT inspections services in Utah (and surrounding areas), and to unlawfully steal Acuren's existing nested and call-out work with Acuren's clients, by engaging with an experienced Acuren employee and commandeering Acuren's Proprietary Information and trade secrets. Mistras knew that hiring Acuren employees with years of Acuren training and experience and knowledge regarding Acuren's client base, client needs, and trade secrets would provide Mistras with a short-cut to growing its own business by creating an unfair competitive advantage.

45.    Indeed, sometime between approximately November 21, 2024 and December 1, 2024, Mistras submitted a bid for nested work with Chevron in Salt Lake City, Utah ("Chevron OSI")—work that Acuren has performed for the two preceding years. On information and belief, Hill submitted the bid on behalf of Mistras. As discussed above, over the course of his employment with Acuren, Hill had developed and was intimately familiar with the details of Acuren's relationship and work for Chevron in the US West Region. On information and belief, Hill assisted Mistras with developing its bid for the Chevron OSI nested work, specifically with respect to the pricing, which undercut Acuren's recently submitted bid by half. Notably, in 2024, Acuren billed—and stands to lose—over seven figures in nested work for Chevron OSI.

46.     Additionally, since Hill joined Mistras, other Acuren clients have asked Acuren to review their rates related to bids for work in 2025. Specifically, PVF Torrence and Chevron's sites in El Segundo, California and Richmond, California questioned Acuren's pricing for their NDT inspection work. Again, Hill was familiar with Acuren's contracts, timelines, and pricing with respect to each of these sites. Thus, on information and belief, Mistras submitted bids at these other locations that, with the help of Hill, undercut Acuren's previously submitted rates.

47.     Acuren also discovered that Hill attempted to log in to an Acuren customer portal to which Hill previously had access through his role with Acuren. Specifically, on December 26, 2024, a dual authentication email from Coupa—a procurement platform used for submitting and storing bid information related to Acuren's client, CenterPoint Energy—providing a code to "finish authenticating" was received at Hill's Acuren email, which was forwarded to Spencer upon Hill's departure.



48.     On information and belief, Hill attempted to use his Acuren log-in information to access the Coupa platform to access information regarding Acuren's bids for work with CenterPoint Energy. Additionally, on December 18, 2024, Acuren was invited by CenterPoint

Energy to participate in a sourcing event for RFP-2025 ILI Support Services ("RFP Event"). The question-and-answer period related to the RFP Event closes on January 20, 2025. On information and belief, Hill attempted to use his Acuren log-in information to access the Coupa platform and access information related to the RFP Event for purposes of submitting proposals to CenterPoint Energy on behalf of Mistras, who, presumably, was not invited to the RFP Event.

49.    Most recently, Acuren learned that on or around January 8, 2024, Hill visited HF Sinclair at its Washington location. Hill developed a client relationship with HF Sinclair during his tenure at Acuren and, in fact, had prepared a large proposal for HF Sinclair on behalf of Acuren in 2024. Further, HF Sinclair's Washington location, although not included in the prior Acuren proposal, was squarely within the region that Hill supervised in his role as Regional Manager and, thus, he had access to and knowledge regarding this particular site.

50.    On information and belief, Hill also has solicited Acuren employees on behalf of Mistras. For example, Hill has posted on LinkedIn three times since joining Mistras: each post sharing Mistras job openings in Montana, Washington, and Salt Lake City, Utah with his connections—many of whom are Acuren employees in those locations that Hill previously supervised:



**G.    Hill Misappropriated Acuren's Trade Secrets and Proprietary Information.**

51.    Hill submitted his resignation on November 4, 2024, but expressed his intention to remain employed with Acuren through November 29, 2024, and continue his employment "with a genuine level of care for [Acuren]." Instead, Acuren has discovered that Hill unlawfully misappropriated the highly sensitive, confidential, and trade secret information which Acuren entrusted him to safeguard and use only for the advancement of Acuren's business.

52.    Believing that Hill had relied on and provided Mistras with Acuren's Proprietary Information to assist in the solicitation of Acuren's customers, Acuren conducted a preliminary forensic investigation following Hill's departure from Acuren of Hill's Acuren-issued laptop.

53.    Specifically, Acuren forensically examined the Acuren assigned laptop returned by Hill upon his resignation. The forensic analysis revealed that between January 2024 and December 2024, at least four external USB storage devices had been connected to the computer. Critically, one USB Device (an IS817 innostor USB Device ("USB Device")) was connected to the laptop (for the first time) on November 25, 2024—following Hill's resignation but prior to Hill returning

18

the laptop—and a folder named "Chevron" was created on the USB Device by the user "Mike.Hill." Another folder titled "Chevron El Segundo" was created on the USB Device by the user "Mike.Hill" seconds later, after a "Chevron El Segundo" folder saved on the laptop's Desktop (under an "Active client files" folder) had been interacted with by the "Mike Hill" user. The logical conclusion based on these computer artifacts is that Hill copied the Chevron El Segundo folder from his Acuren laptop onto the USB Device. Hill did not return the USB Device or any other external devices to Acuren upon his resignation.

54.    Notably, the "Chevron El Segundo" folder on Hill's Acuren laptop contained files titled "2024 El Segundo OSI Work Load Sheet.pdf," "OSI Lumpsum CML Scope of Work_Accuren_Final.pdf," and "ESE Lumpsum Work Package.xlsx," all of which are documents critical for preparing bids for work with Chevron El Segundo. Additionally, the laptop folder contained a subfolder named "V-Deck and LA HFS CVX El Segundo," which contained PowerPoints prepared by Acuren for Chevron El Segundo. The PowerPoint's metadata indicates that it was last modified by Hill on October 24, 2024.

55.    Another folder titled "P66 Rodeo Follow up site info" was created on the same USB Device on that same day, November 25, 2024, by the user "Mike.Hill." Again, an identically named folder existed on Hill's Acuren laptop, leading to the logical conclusion that Hill copied the laptop folder's contents onto the USB Device. The laptop folder of the same name contained a file titled "P66 Rodeo Presentation 6-6-23.pdf," which was a presentation prepared by Acuren for the P66 Rodeo Team regarding its services and containing certain pricing and statistical information. Additionally, the folder contained a file named "7-Acuren QM-001 issue 07 Rev0 – signed.pdf," an Acuren Quality Control Manual, as well as files titled "R-Stamp Certificate Acuren.pdf" and "106318-BPV Cert-JMA PP.pdf," which were Acuren Certificates of

Authorization from the National Board of Boiler & Pressure Vessel Inspectors and the American Society of Mechanical Engineers, respectively. Finally, the folder also contained the resumes of David Flores, an Advanced NDT Technician employed by Acuren in California, and Ernesto Corrales, an NDT Level II Technician employed and trained by Acuren—as indicated by the Certification Summary of Ernesto Corrales.

56.     The forensic analysis also revealed that the user "Mike.Hill" accessed both Google Drive and Dropbox from the Acuren laptop during his employment with Acuren, which was against Acuren's IT Policies.

57.     Upon information and belief, Hill used a non-Acuren sanctioned Dropbox for Acuren work, to which he provided other Acuren employees access. In fact, after Hill's departure, an Acuren employee requested access to this Dropbox account in order to perform certain work for Acuren; given that the Dropbox account did not belong to Acuren, Acuren could not provide access to this Dropbox account containing its information. Acuren believes Hill still has access to this Dropbox account, which likely contains Acuren's Proprietary Information.

58.     As the preceding demonstrates, Hill unlawfully perpetrated the theft of Acuren's proprietary, confidential, and trade secret information. As such, Defendants have endeavored to and may succeed in stealing Acuren's trade secrets, employees, and client work. Acuren has no doubt that Defendants are relying on Acuren's Proprietary Information and trade secret information unlawfully taken by Hill when he departed to join Mistras to solicit Acuren's employees and obtain client work.

## H.     Defendants' Unlawful Action Must be Restrained to Avoid Harm to Acuren.

59.     Mistras recruited Hill for its own benefit, and Hill violated his restrictive covenants and breached fiduciary duties owed to Acuren as his employer. Defendants have and

continue to conspire to tortiously interfere with Acuren's business relationships and to unfairly compete with Acuren. Indeed, the perpetrated theft of Acuren's Proprietary Information and trade secrets has permitted Mistras to promptly submit bids for work from Acuren's long-standing clients (undercutting Acuren in doing so) and unlawfully solicit Acuren's employees and business with Acuren's customers, including Chevron OSI, Chevron El Segundo, Chevron Richmond, and HF Sinclair.

60.    Upon information and belief, Hill is violating the non-solicitation covenants in his Agreement by recruiting Acuren employees and soliciting Acuren clients. Hill is also in breach of his plainly stated confidentiality obligations in his Agreement and has unlawfully taken Acuren's Proprietary Information and trade secrets in violation of federal law. Finally, Mistras recruited and mobilized Hill in an effort to unlawfully disrupt Acuren's business and tortiously interfere with Acuren's client relationships to steal Acuren's call-out and nested client work. Defendants' brazen and continuing conduct, even after being advised by Acuren's in-house legal counsel of Hill's obligations, underscores the fact that Defendants' wrongful conduct will continue without court intervention.

61.    The actions of Hill following his resignation notice, in light of his roles with Acuren and influence thereby, will cause irreparable harm to Acuren. More specifically, Acuren is at risk of losing employees it trained and made significant investments in and significant revenue from its clients. Further, given the competitive nature of Acuren's business and the vitality of the Proprietary Information (as defined in the Agreement) to its financial success, harm is exceedingly imminent to Acuren if Defendants are allowed to continue using and/or disclosing Acuren's Proprietary Information and trade secrets for their benefit. Therefore, Defendants' violations of

law will continue to cause Acuren irreparable harm unless this Court enjoins their impermissible activities.

## CAUSES OF ACTION

Based on the factual allegations in this Complaint, Acuren asserts the following causes of action against Defendants:

### COUNT 1 – BREACH OF CONTRACT[7]
### *Against Defendant Hill*

62.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

63.    Hill entered into an Agreement containing confidentiality and non-solicitation covenants with Acuren. (*See* Ex. 5.)

64.    The Agreement is a valid and enforceable contract.

65.    Hill's receipt of an equity interest and/or award of options in Acuren was conditioned upon his signing of the Agreement and Hill did, in fact, receive an equity interest and/or award of options in Acuren after signing the Agreement.

66.    Acuren has performed all of its material obligations under the Agreement.

67.    In the Agreement, Hill agreed that, for the Restriction Period—defined therein as the date that is two years from the date Hill is no longer employed by Acuren—he will not:

- solicit customers, vendors, manufacturers, business, patronage or orders for, or sell, any products and services in competition with, or for any business that competes with, the Business;

- divert, entice or otherwise take away any customers, vendors, manufacturers, business, patronage or orders of Acuren or attempt to do so; or

---

[7] Acuren asserts its breach of contract claim in accordance with Utah law but does not waive its right to assert that New York law should apply in accordance with the terms of the Agreement. (Ex. 5 at § 5.) Further, Acuren maintains that it can state a valid breach of contract claim against Hill under either state's laws.

- directly or indirectly, (i) solicit or induce or attempt to solicit or induce any Covered Employee to leave employment with Acuren or cease performing services for the benefit of Acuren or (ii) hire any Covered Employee to provide services to any Person other than Acuren.

(Ex. 5 at § 1(a)-(b).)

68.     Again, the Agreement defines the term "Business" as "any businesses conducted by [Acuren] from time to time during the term of this Agreement, including without limitation, nondestructive testing and examination, inspection, rope access, materials engineering, maintenance, repair, industrial and similar services, manufacturing products relating to nondestructive testing and examination, and any other business engaged in by [Acuren], or with respect to which [Acuren] has taken any substantial steps to engage in, at any time during the two year period preceding [Hill's] termination of employment." (*Id.* at § 1(f).)  Further, a "Covered Employee" is defined in the Agreement to mean "any Person who is employed by Parent during the Restriction Period." (*Id.*) Finally, the Agreement defines a "Person" as "any natural person, firm, partnership, association, corporation, company, trust, business trust, or other such entity." (*Id.*)

69.     Additionally, Hill agreed that he:

- shall maintain in strict confidence and shall not directly or indirectly disseminate, disclose or publish, or use for his benefit or the benefit of any Person (other than Acuren) any Proprietary Information or deliver to any Person any document, record, notebook, computer program or similar repository of or containing any Proprietary Information; and

- Upon termination of his employment with Acuren for any reason, Hill shall return to Acuren, in good condition, all Proprietary Information, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of Proprietary Information.

(*Id.* at § 2(b) and (d).)

70.     The Agreement defines "Proprietary Information" to include:

Information with respect to [Acuren's] bids, projects, pricing methods and terms, costs, contractors and subcontractors, operations, processes, protocols, products, inventory, ideas, designs, inventions, know-how, engineering methods, proprietary software, business practices, actual and potential customers and suppliers, marketing methods, contractual relationships, regulatory status, compensation paid to employees or other terms of employment, dealers, distributors, sales representatives, sales, forecasts, projections and long range plans, financial and tax matters including but not limited to financial results and information, manufacturing, selling and servicing strategies and techniques, training, service and business manuals, promotional materials, training course and other training and instructional matters, personnel, plans and opportunities, and customer, vendor, and supplier data and other business information.

(*Id*. at § 2(a).)

71.     The Agreement's terms and, specifically, the non-solicitation and confidentiality covenants therein, are reasonably necessary to protect Acuren's legitimate business interests in its employee and customer relationships, Proprietary Information, and business goodwill and is not in violation of any public policy. Indeed, Hill agreed that his obligations under the Agreement were "reasonable in the context of the Business and the competitive injuries likely to be sustained by [Acuren] if [Hill] was to violate such obligations." (*Id*. at § 3(a).)

72.     Further, the non-solicitation covenants are temporally limited to the Restriction Period, i.e., two (2) years post-employment. Additionally, the scope of the non-solicitation covenant with respect to Acuren's customers is further limited in geographical scope to only Washington, Oregon, California, Utah, Montana, and Colorado. (*Id*. at § 1(a).) This geographic limitation was specifically negotiated by Hill. Similarly, the non-solicitation covenant with respect to Acuren's employees is limited to Covered Employees, or only those persons employed by Acuren during the Restriction Period. (*Id*. at § 1(f).)

73.     Hill's Agreement does not harm or interfere with the public interest.

74.     The terms of the Agreement do not pose an undue hardship on Hill.

75.    The terms of the Agreement are not greater than required for the protection of Acuren's legitimate business interests, including its Proprietary Information and goodwill with its employees and customers.

76.    Hill breached the Agreement by soliciting Acuren employees and customers. Additionally, on information and belief, Hill used and/or disclosed to Mistras Acuren's Proprietary Information, including bid information and Acuren's rates, in order to solicit Acuren's clients to induce them to switch their contracts and business to Mistras. On information and belief, Hill also used or disclosed Acuren's Proprietary Information with a goal of enabling Mistras to lure Acuren's employees away from Acuren.

77.    Acuren has suffered and will continue to suffer damages as a result of Hill's breaches of contract, which are ongoing and expected to continue, including diminished value of its Proprietary Information, damaged goodwill with customers and employees, and loss of competitive advantage.

78.    The amount of Acuren's damages is not presently ascertainable and cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

79.    Based on Hill's actions, it is clear that he will continue to violate his Agreement and, as a result, cause irreparable injury to Acuren, unless this Court enjoins him from doing so.

80.    Notably, Hill expressly recognized and acknowledged that a "breach of [his] covenants in [the] Agreement would cause irreparable damage to [Acuren] and the goodwill of [Acuren], that the amount of such damages would be difficult or impossible to ascertain, and the that remedies at law for any such breach would be inadequate." (*Id*. at § 3(b).) Accordingly, Hill agreed that, in the event of his breach of the Agreement, Acuren "will be entitled to specific

performance and injunctive relief," in addition to any other remedy available at law or in equity. (*Id.*)

81.    If this Court were to grant injunctive relief to Acuren, the burden on Hill would be slight compared to the injury to Acuren if injunctive relief is not granted.

82.    Granting an injunction will not harm the public interest.

83.    Acuren seeks entry of a temporary restraining order, preliminary injunction, and permanent injunction against Hill, enjoining him—consistent with the terms of his Agreement—from soliciting Acuren's employees and customers and from using or divulging Acuren's Proprietary Information.

84.    Acuren demands that Hill be ordered to pay for all of the incurred damages resulting from the foregoing breaches.

85.    Acuren further seeks attorneys' fees and costs and such other and further relief the court deems just.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT
### *Against Defendant Mistras*

86.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

87.    As described in this Complaint, Acuren has a valid and enforceable contract with Hill in which he promised, among other things, not to solicit Acuren's employees or customers and not to use or disclose Acuren's Proprietary Information.

88.    Hill left his employment with Acuren to work for Mistras in a role substantively similar and directly competitive to his former roles at Acuren.

89.    On information and belief, and at least as of December 3, 2024, Mistras had knowledge of Hill's Agreement with Acuren and knew that it prohibited Hill from soliciting

Acuren's employees and customers and using or disclosing Acuren's Proprietary Information. Nonetheless, in its efforts to lure away Acuren's customers, Mistras relied on Hill or Hill's disclosure of Acuren's Proprietary Information to which he was privy as a fiduciary of Acuren in order to submit competitive bids. On information and belief, Mistras has similarly encouraged Hill in his continued solicitation of Acuren's customers and employees since receipt of Acuren's Letter outlining Hill's obligations under the Agreement.

90.     Mistras has willfully and intentionally interfered with Hill's Agreement with Acuren.

91.     Mistras has willfully and intentionally induced, or attempted to induce, Hill to act in a manner that conflicts with the best interests of Acuren, to solicit Acuren employees and customers, and to use or disclose Acuren's Proprietary Information.

92.     Mistras' interference is not privileged or justified.  As a result of Mistras' interference with Acuren's existing contract with Hill, Acuren has suffered actual damages and irreparable harm, including, among other things, loss of goodwill, loss of value in its contractual relationships with employees and customers, diminished value in its Proprietary Information, damage to its reputation, and other pecuniary loss.

93.     Based on Mistras' unlawful interference, Acuren is entitled to all actual damages proximately caused by Mistras' acts of interference.  Additionally, Acuren is entitled to exemplary damages because Mistras' acts of interference were willful and malicious.

94.     Acuren's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

95.     Given that Mistras remains undeterred by Acuren's Letter, Mistras will inevitably continue its interference with Acuren's existing contracts with Hill and other Acuren employees,

which will irreparably injure Acuren, unless this Court enjoins its improper activities. Acuren, therefore, is also entitled to injunctive relief to prevent this tortious interference in the future.

### COUNT III – MISAPPROPRIATION OF TRADE SECRETS / VIOLATION OF DEFEND TRADE SECRETS ACT
#### *Against Defendants*

96.     Acuren incorporates by reference each of the foregoing paragraphs as if full set forth in this count.

97.     Acuren possess highly unique and valuable information related to its NDT inspection services for call-out and nested work—specifically, as relevant to this Complaint: (1) protected customer information (customer lists, job history, job schedules, pricing, rates, bids, quotes, opportunities, contacts, MSA terms and expiration dates, contracts, preferences, purchasing history, sales volume, frequencies/schedules, and reports); (2) protected employee information (employee lists containing contact information, compilations of job duties and responsibilities tailored to customer needs, compensation, and benefits); (3) protected financial and operational information (operational strengths and weaknesses, profit and loss information, revenue information, budgets and forecasts, business plans, growth and marketing strategies, growth for managing KPIs, marketing plans, and pricing strategies); (4) protected inspection manuals, methods, testing procedures, reports, and quality and safety programs; and (5) protected contractor and vendor information (preferred vendor sources for products, vendor purchasing histories, compilations of vendor pricing, rates, and services with relationship discounts, vendor lists containing contact information for key decision-makers, vendor preferences, contractor lists containing contact information, preferred contractors for certain geographic regions or customers, contractor pricing, rates, discounts, and mark-ups, and specialized services performed by contractors). This compiled information is confidential, proprietary, not generally known to the

public, and constitutes trade secrets within the meaning of the DTSA.

98.    Acuren's principal place of business is in Texas, but it operates in almost every other state in the United States. It also regularly transacts business in states other than Texas, including in person and by phone, internet, and mail. Acuren's trade secrets relate to this business and Acuren uses them in interstate commerce.

99.    Acuren has taken reasonable measures to keep this information secret and confidential, including but not limited to requiring its employees with access to this information to sign confidentiality or other restrictive covenant agreements, requiring employees to abide by confidentiality and IT usage policies, password-protecting access to certain of Acuren's electronically stored information, physical and technical security measures related to its offices, limiting access rights to certain information, and using confidentiality disclaimers on emails transmitted to third parties.

100.    This information has independent economic value because it is not generally known to, and is not readily ascertainable by proper means by, persons other than Acuren who could obtain economic value from its disclosure or use. Acuren compiled its confidential and trade secret information over many years and at great expense.

101.    Defendants, by engaging in and continuing to engage in the conduct and activities described herein, have violated the DTSA through their improper acquisition, disclosure, and use of Acuren's trade secrets, which constitute actual and threatened misappropriation. Hill performs and/or has performed essentially the same work for Mistras that he performed for Acuren. Hill had, and continues to have, access to, and possession of, Acuren's trade secrets.

102.    Defendants have actually used, plan to use, and will inevitably use Acuren's trade secrets. Given the similarities between Hill's work for Mistras and Acuren—and the fact that

Mistras and Acuren are direct competitors—it is inevitable and threatened that Hill will use and/or disclose Acuren's trade secrets in his work for Mistras. Further, upon information and belief, Hill stole Acuren's files containing proprietary, confidential and trade secret information and has failed to return external storage devices and electronically stored information to Acuren, despite Hill's obligation to do so.

103.    Defendants are using Acuren's trade secrets (as identified *supra* in paragraph 95) to solicit and service Acuren's customers, to solicit Acuren's employees, and to operate a competing inspection business through improper, unfair practices.

104.    Defendants owed, and continue to owe, Acuren a duty to maintain the secrecy of its information. Defendants knew or had reason to know, and continue to know or have reason to know, of that duty at the time they misappropriated Acuren's trade secret information without Acuren's consent.

105.    Acuren has suffered and will continue to suffer irreparable harm because of Defendants' unlawful conduct and the disclosure and misappropriation of trade secret information. Defendants' activities will result in a substantial loss of business for Acuren, now and in the future. Acuren has no adequate remedy at law because Defendants' actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace. Thus, Acuren is entitled to injunctive relief to prevent further irreparable harm under the DTSA.

106.    Defendants' actions were willful, malicious, and intended to injure Acuren and its business.

107.    As a direct and proximate result of Defendants' misappropriation, Acuren has suffered irreparable harm, injuries, and damages, and will continue to suffer irreparable harm, injury, and damages—including but not limited to loss of relevant market share, injury to business

reputation and goodwill, loss of profits, and attorneys' fees and costs. Defendants have gained an unfair competitive advantage and other unjust enrichment through the misuse of Acuren's trade secrets.

108.    Under the DTSA, Acuren is entitled to and seeks a temporary restraining order, preliminary injunction, and permanent injunction against Defendants to enjoin their use of Acuren's trade secrets.

109.    Further, under the DTSA, Acuren is entitled to and requests an award of damages in its favor for actual loss caused by the misappropriation, damages for all unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss, and/or damages measured by imposition of liability for a reasonable royalty for the unauthorized disclosure or use of Acuren's trade secrets.

110.    Finally, under the DTSA, Acuren is entitled to and requests exemplary damages in an amount not more than two times Acuren's actual damages, plus reasonable attorneys' fees.

**COUNT IV – MISAPPROPRIATION OF TRADE SECRETS / VIOLATION OF UTAH UNIFORM TRADE SECRET ACT**
***Against Defendants***

111.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

112.    Acuren possess highly unique and valuable information related to its NDT inspection services for call-out and nested work—specifically, as relevant to this Complaint: (1) protected customer information (customer lists, job history, job schedules, pricing, rates, bids, quotes, opportunities, contacts, MSA terms and expiration dates, contracts, preferences, purchasing history, sales volume, frequencies/schedules, and reports); (2) protected employee information (employee lists containing contact information, compilations of job duties and

31

responsibilities tailored to customer needs, compensation, and benefits); (3) protected financial and operational information (operational strengths and weaknesses, profit and loss information, revenue information, budgets and forecasts, business plans, growth and marketing strategies, growth for managing KPIs, marketing plans, and pricing strategies); (4) protected inspection manuals, methods, testing procedures, reports, and quality and safety programs; and (5) protected contractor and vendor information (preferred vendor sources for products, vendor purchasing histories, compilations of vendor pricing, rates, and services with relationship discounts, vendor lists containing contact information for key decision-makers, vendor preferences, contractor lists containing contact information, preferred contractors for certain geographic regions or customers, contractor pricing, rates, discounts, and mark-ups, and specialized services performed by contractors). This compiled information is not generally known to the public and constitutes trade secrets within the meaning of the UUTSA.

113.    Acuren has taken reasonable measures under the circumstances to keep this information secret, including but not limited to requiring its employees with access to this information to sign confidentiality or other restrictive covenant agreements, requiring employees to abide by confidentiality and IT usage policies, password-protecting access to certain of Acuren's electronically stored information, physical and technical security measures related to its offices, limiting access rights to certain information, and using confidentiality disclaimers on emails transmitted to third parties.

114.    This information has independent economic value because it is not generally known to, and is not readily ascertainable by proper means by, persons other than Acuren who could obtain economic value from its disclosure or use. Acuren compiled its confidential and trade secret information over many years and at great expense.

115.    Acuren provided Hill access to its trade secrets (as identified *supra* in paragraph 111) only after he became an employee of Acuren. Acuren entrusted Hill with access to its trade secrets to perform his various duties (and roles) for Acuren. Hill knew, or had reason to know, that the trade secrets are Acuren's exclusive property and were not to be disclosed or used except in further of Acuren's business objectives. Hill further knew, or had reason to know, that upon termination of his Acuren employment, the Acuren trade secrets were to be returned to Acuren and not disclosed to anyone or used for any purpose.  Hill did not have Acuren's express or implied consent to disclose or use Acuren's trade secrets in any way after his employment ended.

116.    Hill knew, or had reason to know, that he had a duty to maintain the secrecy of Acuren's trade secrets. Hill knew, or had reason to know, that it would be improper to save Acuren's trade secrets to his personal USB Device and/or to use the Acuren trade secrets for his personal gain or that of Mistras' without permission from Acuren.

117.    Mistras knew or had reason to know that Hill was sharing Acuren's trade secrets with it, and that Mistras was obtaining Acuren's trade secrets through improper means, and that Hill had a duty to maintain the secrecy of the Acuren trade secrets. Mistras nevertheless knowingly and willfully continued to receive and use Acuren's trade secrets for its own economic advantage.

118.    Defendants, by engaging in and continuing to engage in the conduct and activities described herein, have violated the UUTSA through their improper acquisition, disclosure, and use of Acuren's trade secrets, which constitute actual and threatened misappropriation. Hill performs and/or has performed essentially the same work for Mistras that he performed for Acuren. Hill had, and continues to have, access to, and possession of, Acuren's trade secrets.

119.    Defendants have actually used, plan to use, and will inevitably use Acuren's trade secrets. Given the similarities between Hill's work for Mistras and Acuren—and the fact that

Mistras and Acuren are direct competitors—it is inevitable and threatened that Hill will use and/or disclose Acuren's trade secrets in his work for Mistras. Further, upon information and belief, Hill stole Acuren's files containing proprietary, confidential and trade secret information and have failed to return external storage devices and electronically stored information to Acuren, despite Hill's obligation to do so.

120. Defendants are using Acuren's trade secrets (as identified *supra* in paragraph 111) to solicit and service Acuren's customers, to solicit Acuren's employees, and to operate a competing inspection business through improper, unfair practices.

121. Defendants owed, and continue to owe, Acuren a duty to maintain the secrecy of its information. Defendants knew or had reason to know, and continue to know or have reason to know, of that duty at the time they misappropriated Acuren's trade secret information without Acuren's consent.

122. Acuren has suffered and will continue to suffer irreparable harm because of Defendants' unlawful conduct and the disclosure and misappropriation of trade secret information. Defendants' activities will result in a substantial loss of business for Acuren, now and in the future. Acuren has no adequate remedy at law because Defendants' actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace. Thus, Acuren is entitled to injunctive relief to prevent further irreparable harm under the UUTSA pursuant to Utah Code Ann § 13-24-3.

123. Defendants' actions were willful, malicious, and intended to injure Acuren and its business.

124. As a direct and proximate result of Defendants' misappropriation, Acuren has suffered irreparable harm, injuries, and damages, and will continue to suffer irreparable harm,

injury, and damages—including but not limited to loss of relevant market share, injury to business reputation and goodwill, loss of profits, and attorneys' fees and costs. Defendants have gained an unfair competitive advantage and other unjust enrichment through the misuse of Acuren's trade secrets.

125.    Under the UUTSA, Acuren is entitled to and seeks a temporary restraining order, preliminary injunction, and permanent injunction against Defendants to enjoin their use of Acuren's trade secrets.

126.    Further, under the UUTSA, Acuren is entitled to and requests an award of damages in its favor for actual loss caused by the misappropriation, unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss, and/or damages measured by imposition of liability for a reasonable royalty for the unauthorized disclosure or use of Acuren's trade secrets.

127.    Finally, under the UUTSA, Acuren is entitled to and requests exemplary damages in an amount not more than two times Acuren's actual damages. Acuren additionally seeks to recover its reasonable attorneys' fees given that Defendants' misappropriation was willful and malicious.

## COUNT V – BREACH OF FIDUCIARY DUTY/
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### *Against Defendants*

128.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

129.    Hill had a fiduciary relationship with Acuren.

130.    Hill owes a fiduciary duty to Acuren arising from his position as a former employer of Acuren and based on his relationship with, and work for, Acuren. Specifically, Hill owed

Acuren a duty to act in good faith, with the care of an ordinarily prudent person in a like position, and in a manner he reasonably believed to be in Acuren's best interests.

131.    Hill breached his fiduciary duties to Acuren when he enacted plans to disrupt Acuren's business operations. For example, Hill failed to act in Acuren's best interests when he abruptly left Acuren in the midst of making future plans for an expanded role and immediately joined Mistras.  Instead, Hill conspired to leave Acuren and instantly solicit customers to leave and join Acuren's competitor, Mistras. Further, on information and belief, Hill used time while being paid by Acuren to further the business interests of Mistras. Hill perpetrated the preceding conduct in a manner adverse to Acuren's interests and without Acuren's consent.

132.    Upon information and belief, Mistras knew that Hill had fiduciary duties to Acuren and that Hill breached those duties, and Mistras provided substantial assistance and encouraged the furtherance of Hill's breaches by employing, and/or retaining the services of, Hill and incentivizing him to solicit Acuren employees and customers. As a result, Mistras may be held liable for aiding in the breach of Hill's fiduciary duty under Utah law.

133.    Mistras encouraged the breach of numerous fiduciary duties by Hill and conspired to conceal and further those fiduciary breaches with Hill to dishonestly accomplish a tortious result. At all relevant times, Mistras knew that Hill was committing an on-going tort and fiduciary breaches to Acuren. Mistras' participation was a substantial factor and proximate cause in Hill's fiduciary breaches. Further, Hill's fiduciary breaches were made for Mistras' financial benefit.

134.    Such actions taken by Hill and Mistras have proximately caused injury and damages, and will continue to cause damage, to Acuren. Such breaches have also benefited Hill and Mistras and were willful and malicious. Acuren is entitled to actual damages, special damages, and punitive damages in an amount within the jurisdictional limits of this Court. *See* Utah Code

Ann. § 78B-8-201. Acuren also seeks injunctive relief prohibiting Hill and Mistras from further breaches.

**COUNT VI – TORTIOUS INTERFERENCE WITH EXISTING AND/OR POTENTIAL ECONOMIC RELATIONS**
***Against Defendants***

135.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

136.    Acuren has valid existing contracts and/or potential economic relationships with its current customers. Mistras and Hill have willfully and intentionally interfered with these contracts and prospective business relationships.

137.    Mistras and Hill have induced, or attempted to induce, Acuren's existing clients, as well as prospective business relationships, to reduce or eliminate their business relationship with Acuren.

138.    The acts of Mistras and Hill were malicious and constituted an intentional interference without justification. The acts of Mistras and Hill are independently tortious in that, among other things, these acts constitute breach of fiduciary duty and civil conspiracy. Mistras and Hill did such acts knowing that their interference with Acuren's existing contracts and prospective business relationships was certain, or substantially certain, to occur as a result of their conduct. As discussed herein, Mistras and Hill also acted to directly sabotage Acuren's business, including through the undercutting of Acuren's bids and usurping of corporate opportunities, which impacted prospective relationships with customers.

139.    Mistras' and Hill's interference is not privileged or justified.  As a result of their interference with Acuren's existing contracts and prospective business relationships, Acuren has suffered actual damages and irreparable damages, including, among other things, loss of goodwill,

damage to their reputation, and other pecuniary loss.  Based on Mistras' and Hill's unlawful interference, Acuren is entitled to all actual damages proximately caused by their acts of interference.  Additionally, Acuren is entitled to exemplary damages because Mistras' and Hill's acts of interference were willful and malicious.

140.    Mistras and Hill will continue their interference with Acuren's existing contracts and prospective business relationships, which will irreparably injure Acuren, unless this Court enjoins their improper activities.  Acuren, therefore, also is entitled to injunctive relief to prevent this tortious interference in the future.

### COUNT VII – CIVIL CONSPIRACY
#### *Against Defendants*

141.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

142.    On information and belief, Hill and Mistras designed and effectuated a premeditated plan to disrupt Acuren's employee and customer relationships.  Hill accepted a position with Mistras and purposefully kept this fact under wraps for several weeks so Hill could continue working for Acuren during which time he perpetrated their unlawful plan to solicit Acuren's employees and customers.

143.    Defendants conspired to intentionally and unlawfully engage in the acts described in paragraph 123.  It is evident that Defendants had a meeting of the minds at the time that Mistras offered Hill his new position and, certainly, no later than November 4, 2024—the date on which Hill originally prepared his notice of resignation—wherein they came together to achieve this unlawful purpose through unlawful means.

144.    Each of the Defendants acted in furtherance of this conspiracy by, among other things, tortiously interfering with Acuren's existing and prospective economic relations and breaching and/or aiding and abetting in the breach of Hill's fiduciary duties owed to Acuren.

145.    Mistras not only allowed itself to knowingly profit from Hill's violations of his covenants and fiduciary duties, but it also aided, abetted, and encouraged his unlawful competition with the intent of harming Acuren and depriving Acuren of its employees and clients.

146.    Thus, Mistras conspired with Hill to commit the unlawful acts described and alleged herein to unlawfully compete against Acuren and solicit Acuren's employees and clients in whom Acuren has invested time and resources. Defendants are therefore liable for conspiracy to intentionally and unlawfully harm Acuren.

147.    As a result of Defendants' civil conspiracy, Acuren has suffered injury and damages. Further, Defendants actions constituted willful and malicious or intentionally fraudulent conduct. Thus, pursuant to Utah Code Ann. § 78B-8-201, Acuren is entitled to an award of exemplary or punitive damages in an amount to be determined at trial.

148.    Defendants are jointly and severally liable for all damages caused by these intentional and willful acts of conspiracy.

### COUNT VIII – CONVERSION
*Against Hill*

149.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

150.    Hill entered into a valid and enforceable Agreement with Acuren. Based on the confidentiality and other restrictive covenants therein, Acuren provided Hill with access to Acuren's Proprietary Information, as that term is defined in the Agreement.

151.    On information and belief, Hill misused and relied upon Acuren's Proprietary Information while working on behalf of Mistras and in order to unfairly compete with Acuren.

152.    At all relevant times, Acuren had a legal right to its Proprietary Information, which is owned by Acuren. Acuren has an absolute and unconditional right to immediate possession of its own confidential information.

153.    On December 3, 2024, Acuren demanded in writing that Hill return to Acuren any of Acuren's tangible confidential, proprietary, or trade secret information in his possession and "in any form." (*See* Ex. 7.)

154.    Hill has failed to return to Acuren the Acuren Proprietary Information in his possession, including—but not limited to—the information saved on the USB Device or other external devices.

155.    By continuing to refuse to return the Acuren Proprietary Information in his possession, Hill has committed a lawfully unjustified, willful interference with Acuren's Proprietary Information that deprives Acuren of the exclusive use and possession of such confidential information.

156.    As a direct and proximate result of Hill's refusal to return Acuren's Proprietary Information, Acuren has suffered damages, including the loss of the exclusive use and possession of such valuable information.

## COUNT IX – RESPONDEAT SUPERIOR/AGENCY, RATIFICATION, VICE PRINCIPAL, AND ACTUAL AUTHORITY

157.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

158.    Acuren has been injured as a result of actions committed by Defendants.

159.    Upon information and belief, Hill is an employee of Mistras, and certain of these

actions were committed while he was acting within the scope of his employment with Mistras. The acts committed by Hill were within his general authority, in furtherance of Mistras' business, and were for the accomplishment of the object for which he was hired. Mistras intentionally conferred authority on Hill, intentionally allowed him to believe he had authority, or, by a lack of due care, allowed him to believe he had authority.

160.    Hill was acting within the scope of his agency on behalf of Mistras when they committed the unlawful acts. Mistras approved the acts by word, act, or conduct after acquiring full knowledge of the acts. Mistras' approval was given with the intention of giving validity to Hill's acts.

## REQUEST FOR INJUNCTIVE RELIEF

161.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

162.    Under the DTSA and UUTSA, and due to Hill's breach of contract, Acuren is entitled to a temporary restraining order, preliminary injunction, and permanent injunction against Defendants preventing: (1) any disclosure of its Proprietary Information (as defined in Hill's Agreement); and (2) any actual or threatened misappropriation of its trade secrets by Defendants and each of their agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of the foregoing (collectively, "Covered Persons").

163.    The temporary restraining order, preliminary injunction, and permanent injunction should include an order prohibiting the Covered Persons from using or disclosing any of Acuren's Proprietary Information, as defined in Hill's Agreement, and trade secrets—specifically, as relevant to this Complaint: (1) protected customer information (customer lists, job history, job schedules, pricing, rates, bids, quotes, opportunities, contacts, MSA terms and expiration dates,

contracts, preferences, purchasing history, sales volume, frequencies/schedules, and reports); (2) protected employee information[8] (employee lists containing contact information, compilations of job duties and responsibilities tailored to customer needs, and other private or confidential information belonging to Acuren and/or the employee); (3) protected financial and operational information (operational strengths and weaknesses, profit and loss information, revenue information, budgets and forecasts, business plans, growth and marketing strategies, growth for managing KPIs, marketing plans, and pricing strategies); (4) protected inspection manuals, methods, testing procedures, reports, and quality and safety programs; and (5) protected contractor and vendor information (preferred vendor sources for products, vendor purchasing histories, compilations of vendor pricing, rates, and services with relationship discounts, vendor lists containing contact information for key decision-makers, vendor preferences, contractor lists containing contact information, preferred contractors for certain geographic regions or customers, contractor pricing, rates, discounts, and mark-ups, and specialized services performed by contractors).

164.    Further, the temporary restraining order, preliminary injunction, and permanent injunction should include an order requiring the Covered Persons to return to Acuren, and not keep, any and all Proprietary Information (as defined in Hill's Agreement) and trade secrets of Acuren's, including, without limitation, any of the information listed above in paragraph 144. Defendants also should be enjoined from destroying, deleting, erasing, modifying, or otherwise failing to preserve intact any documents, records, or files (written or electronically stored) or any other evidence regarding or related to Acuren's claims and allegations in this Complaint, including, without limitation, any evidence stored on any personal or Mistras computer, electronic device,

---

[8] Excluded from the proposed injunctive relief is Hill's own wage/compensation information.

cloud-based storage account, mobile device, or email account(s).

165.    The temporary restraining order, preliminary injunction, and permanent injunction additionally should include an order requiring Hill to comply with the confidentiality obligations, as well as the non-solicitation covenants, contained in his Agreement, as well as order enjoining Mistras from authorizing or directing Hill to violate these contractual obligations.

166.    Specifically, the temporary restraining order, preliminary injunction, and permanent injunction should enjoin Hill from, directly or indirectly, anywhere in the states of Washington, Oregon, California, Utah, Montana, or Colorado, (i) soliciting customers, vendors, manufacturers, business, patronage or orders for, or selling, any products and services in competition with, or for any business that competes with, the Business; or (ii) diverting, enticing, or otherwise taking away any customers, vendors, manufacturers, business, patronage or orders of Acuren or attempting to do so. Acuren seeks to limit such non-solicitation restrictions, as it relates to customers only, to, without limitation, any of the following customers of Acuren, including any subsidiaries, affiliated entities, or successors for whom Acuren may provide services: Gulf Run Transmission, LLC, Callumet, CHS Refinery, ABB, Chevron Richmond, Chevron El Segundo, Chevron OSI, Phillips 66, P66 Rodeo, Georgia Pacific, PBF Toledo, PVF Torrence, BHI, Marathon Petroleum Company LP, Par Pacific Holdings, Inc., Gulf Run Transmission, LLC, CBI Services/McDermott, HF Sinclair, Valero Benicia Refinery, Formosa Plastics, DOW Seedrift, and CenterPoint Energy, LLP. The temporary restraining order, preliminary injunction, and permanent injunction should likewise enjoin Mistras from authorizing or directing Hill to engage in any of the aforementioned solicitation activities.

167.    Additionally, the temporary restraining order, preliminary injunction, and permanent injunction should enjoin Defendants from directly or indirectly soliciting or inducing

or attempting to solicit or induce any person who is employed by Acuren during the Restriction Period, *i.e.*, from November 22, 2024 through November 22, 2026, to leave employment with Acuren or cease performing services for the benefit of Acuren, or from hiring any such employee to provide services to any person other than Acuren. Further, the temporary restraining order, preliminary injunction, and permanent injunction should enjoin Mistras from authorizing or directing Hill to engage in any of the aforementioned solicitation or hiring activities of Acuren employees.

168.    The temporary restraining order, preliminary injunction, and permanent injunction should further require Defendants to make available, within 48 hours, for forensic imaging (i) the USB Devices connected to Hill's Acuren-issued computers, (ii) any personal phones and computers, and (iii) any business computers, phones, servers, external storage devices, USB devices, OneDrives, Sharepoints, Dropboxes, cloud-based accounts, and other devices and computers containing or that have contained material relating or belonging to or obtained from Acuren.

169.    Acuren requests that this Court equitably toll the duration of the non-solicitation covenants in Hill's Agreement for a period of time based on the length of time of Hill's breaches of his non-solicitation covenants and add such period of time to the duration of the restrictions in the permanent injunction enforcing the restrictive covenants.

170.    Had Hill not breached his obligations to Acuren—in particular, but without limitation, his obligation to act in Acuren's best interests—none of the Covered Persons would have access to the trade secrets and/or Proprietary Information listed in paragraph 144 above.

171.    Hill failed to return to Acuren highly-sensitive, proprietary, confidential, and trade secret information stored on his personal external storage devices, and, in all likelihood, Mistras'

computers.

172.    Thus, unless the Covered Persons are enjoined from the conduct described herein, there is a substantial threat that Acuren will continue to suffer irreparable harm, including loss and misuse of its proprietary, confidential, and trade secret information, loss of goodwill, and financial losses that are presently not calculable.

173.    The irreparable harm that Acuren will suffer if injunctive relief is denied outweighs the potential harm (if any) to Defendants if injunctive relief is granted.

174.    Granting the requested injunctive relief will not disserve the public interest.

175.    Acuren's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief.

176.    Thus, Acuren is entitled to injunctive relief in the form of a temporary restraining order, preliminary injunction, and permanent injunction as set forth herein.

## DAMAGES

177.    Acuren incorporates by reference the preceding paragraphs in the Complaint.

178.    As a result of Defendants' actions, Acuren has been damaged. Thus, Acuren requests all actual damages resulting from, or proximately caused by, Defendants' actions as described in this Complaint.

179.    Further, Defendants' conduct has been intentional, malicious, and willful and, therefore, entitles Acuren to an award of exemplary damages.

## ATTORNEYS' FEES

180.    Acuren incorporates by reference the preceding paragraphs in the Complaint.

181.    As a result of Defendants' actions, Acuren has engaged the undersigned attorneys and agreed to pay their reasonable attorneys' fees, costs, and expenses incurred in prosecuting this

suit to protect Acuren's rights. Acuren seeks recovery of these attorneys' fees, costs, and expenses as allowed by law and/or contract.

## CONDITIONS PRECEDENT

182.    All conditions precedent have been performed or have occurred, entitling Acuren to the relief requested in this Complaint.

## ALTERNATIVE REFORMATION

183.    In the alternative, in the event the Court finds any part of the restrictive covenants that Acuren seeks to enforce against Hill in his Agreement to be too broad to be enforced, or otherwise unenforceable, Acuren requests the Court to reform that restriction, if any, so as to make the restriction enforceable to the maximum extent allowed by law.

## JURY DEMAND

184.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Acuren hereby asserts its right to a trial by jury on all counts so triable.

## PRAYER FOR RELIEF

With respect to this Complaint, and based on the foregoing, Acuren prays for the following relief:

1.  Entry of a temporary restraining order and, pending trial on the merits, a preliminary injunction enjoining Defendants from unlawfully soliciting Acuren's employees and customers, disclosing or using Acuren's Proprietary Information or trade secrets, and requiring Defendants to provide certain devices for inspection and forensic imaging;

2.  Entry of a permanent injunction enjoining Defendants from unlawfully soliciting Acuren's employees and customers and disclosing or using Acuren's Proprietary Information or trade secrets (as requested above);

46

3. Entry of judgment ordering specific performance by Hill of the non-solicitation, confidentiality, and return of property provisions in his Agreement;

4. Entry of judgment in Acuren's favor and against Defendants and order Defendants to pay damages to Acuren, in an amount to be proved at trial, plus interest, costs, exemplary damages, and attorneys' fees as allowed by law and/or contract; and

5. Entry of a judgment awarding Acuren all other relief, legal or equitable, to which they may be entitled.


Dated: <u>January 10, 2025</u>                    Respectfully submitted,

                                            ACUREN INSPECTION, INC.

                                            */s/ Meghaan Madriz*
                                            MCGUIREWOODS LLP

                                            -AND-

                                            */s/ Sarah C. Vaughn*
                                            FABIAN VANCOTT

                                            **ATTORNEYS FOR PLAINTIFF
                                            ACUREN INSPECTION, INC.**